Filed 9/29/23  P. v. Russell CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SIDNEY RAYBURN RUSSELL,<br><br>Defendant and Appellant. | F084646<br><br>(Super. Ct. No. VCF400150)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Sidney Rayburn Russell arranged to be alone with 12-year-old D.A. and then used his arms and legs to restrain her as he rubbed her vaginal area through her clothes and rubbed his penis against her back. A jury convicted defendant of forcible lewd acts upon a child, and the trial court sentenced defendant to a term of 75 years to life under the "Three Strikes" law.

On appeal, defendant argues that (1) the evidence was insufficient that he touched D.A. when D.A.'s testimony established that defendant only touched her pubic area rather than her vagina as alleged in the information, (2) the evidence of defendant's restraint of D.A. during the touching was insufficient to establish the touching was forcible, (3) the trial court erred in admitting evidence of defendant's prior sexual convictions from 1992 under Evidence Code section 1108, and (4) the trial court abused its discretion in denying his motion to strike his prior convictions.

We reject defendant's arguments and affirm the judgment.

**PROCEDURAL BACKGROUND**

The District Attorney of Tulare County filed an information on July 13, 2021, charging defendant with forcible lewd acts upon a child (Pen. Code, § 288, subd. (b)(1);[1] counts 1, 2) and alleged that defendant was a habitual sexual offender (§ 667.71), had a prior conviction, a circumstance pursuant to section 667.61, subdivision (d)(1) of the alternate sentencing scheme of the "One Strike" law (§ 667.61), and had several prior "strike" convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

A jury convicted defendant of both counts of forcible lewd acts on a child on May 17, 2022. After defendant waived his right to a jury trial regarding his prior convictions, the trial court found the allegations to be true. The trial court sentenced

---

[1]     Undesignated statutory references are to the Penal Code.

defendant to two concurrent terms of 75 years to life in prison under the Three Strikes and "Habitual Sexual Offender" laws (§§ 667.71, 1170.12) and two stayed terms of 25 years to life in prison under the One Strike law.  The court also ordered defendant to pay victim restitution (§ 1202.4, subd. (f)), a $300 restitution fine (§ 1202.4), a suspended $300 parole revocation restitution fine (§ 1202.45), a $500 habitual sex offender fine (§ 290.3), a $1,000 child abuse prevention restitution fine (§ 294, subd. (a)), and $60 criminal conviction (Gov. Code, § 70373) and $80 court operations (§ 1465.8) assessments.

Defendant timely appealed on July 18, 2022.

## FACTS

D.A. testified that she was 14 years old and lived with her mother, Susan A., and brother, Z.A., in a mobile home park at the time of defendant's trial.  D.A. attended classes for special needs children.  In July 2020,[2] D.A. was sitting outside with Susan and Z.A. looking at the stars at approximately 8:00 p.m., and defendant stopped by on his bicycle and asked Susan for a cigarette.  During the conversation, defendant asked Susan for permission to take D.A. for a bicycle ride, an activity D.A. used to do with her father.  Susan gave permission, and D.A. rode on defendant's bicycle seat while defendant sat in front of her peddling.  Susan would not let D.A. ride her own bicycle because it was getting dark, and her bicycle did not have a light on it.  Defendant rode around the mobile home park and stopped at a brick wall and fence located in front of a vacant house. Although defendant told D.A. that he was out of breath, he did not seem to be out of breath.

Defendant leaned against the brick wall and told D.A. to come to him and instructed her to sit on his lap.  Defendant moved his legs and locked them so that D.A. was unable to move her legs.  Defendant then gripped her by wrapping his arms around

---

[2]     Subsequent references to dates are to dates in the year 2020, unless otherwise stated.

D.A.'s chest. His hands were still when they were wrapped around her chest. D.A. asked defendant what he was doing, but defendant was breathing heavy, shaking, and did not respond. D.A. told defendant to stop and to let her go, but defendant told her to relax. Defendant was holding her so tightly that she could not move even though she tried.

D.A. testified that she thought defendant was trying to sexually abuse her and attempted to break free. She was scared and thought defendant must be crazy because she was only 12 years old, and defendant was 42 years old. She tried to pull defendant's hands off her, but she was too weak. She also tried to kick him off, but defendant's legs were locked, and defendant tightened his legs and squeezed her legs harder.

D.A. testified that when defendant put his arms around her, he touched her "vagina area" over her clothes and shook a lot. When asked to describe it later in her testimony, D.A. described that defendant's hand was resting on her vagina area and his body was still. She thought he was trying to rub her vagina area because defendant used his hand to rub across the upper portion of her vagina that was not between her legs, and then he rubbed downward. D.A. tried to pull defendant's hand away, but he continued to rub the area. Defendant's legs and hands trembled.

D.A. could also feel defendant's penis on her back, and defendant was poking her with it and trying to hump her, but he could not get far because she was wearing clothes and she moved her body forward and away from it. Defendant asked D.A. if she could feel "it" while he was touching her back with his penis. His arms were still wrapped around her lower waist.

D.A. told defendant to leave her alone and tried to break free. Defendant told her to stop squirming. When she tried to pull away, defendant pulled her back by grabbing her sweater. She fell back into defendant's lap, but defendant's hands were hanging away from her and he could not wrap them around her. Defendant used his legs to squeeze her harder and trap her. She tripped as she tried to free herself, fell to the ground, scratched her leg, and started to cry.

4.

At that same time, Susan called defendant, and defendant told D.A. to stop crying and to act normal. Defendant appeared nervous and worried and told D.A. to tell Susan that she was fine. After the call, defendant angrily asked D.A. why Susan would call him. Defendant took D.A. home, but she did not tell Susan what happened until later. It was a few days after the incident when D.A. told Susan that defendant had touched her in her vagina area, upper leg, and near her ribs.

D.A. met defendant approximately three days before the incident when he stopped by her home and asked Susan for a cigarette. Defendant and Susan flirted, and D.A. thought he would be good for their family. Defendant returned later to their home and brought bicycles for D.A. and Z.A. D.A. also remembered taking food to defendant's home and saw defendant while watching fireworks at the mobile home park.

Susan testified that she met defendant and his friend, Cory R., as they were riding bicycles past her home in the mobile home park. She provided defendant a cigarette and they talked for approximately 45 minutes. Defendant returned the next day to visit Cory, and Susan spoke with him again. She may have introduced D.A. and Z.A. to defendant at that time. She spoke with defendant for an hour or two and again later when he returned that evening. Susan thought that defendant was "cool" and that they would date, but defendant appeared to lose interest despite her attempts to make sexual advances with him.

Susan accompanied defendant to his house to get his laundry the next day, and then did his laundry at her residence. Susan and her children visited defendant's house another day, and defendant offered to give the children bicycles. She picked up the bicycles from defendant's house at a later time. D.A. told her that defendant had come over early one morning while she was sleeping and took D.A. for a bicycle ride.

One night, D.A. asked if defendant could take her for a ride on his bicycle, and Susan gave her permission. Susan became nervous when they did not return and decided to call defendant. She thought defendant sounded out of breath, and defendant said that

5.

he had hurt his leg and would be home soon. Susan did not notice anything out of the ordinary when defendant and D.A. returned.

On July 4, Susan joined her children and defendant at a location in the mobile home park where people had gathered to watch fireworks. D.A. was sitting on defendant's lap. Susan called D.A. to her, ascertained that D.A. was fine, and D.A. went back to sit on defendant's lap. Defendant convinced Susan to ride his bicycle, and she left to ride around the park for five or 10 minutes.

Thereafter, Susan was speaking with D.A.'s therapist and expressing concern about whether D.A. would talk to Susan if anyone hurt D.A. when D.A. interrupted and asked to talk to Susan. D.A. told Susan about the incident with defendant, and Susan immediately contacted the police.[3]

D.A.'s older brother, Z.A., met defendant when he was having a cigarette with Susan. Z.A. got a bad feeling about defendant when defendant gave them the bicycles. On July 4, while watching fireworks, D.A. sat on defendant's lap while defendant rubbed her shoulders, but Z.A. was too scared to voice his concerns. Z.A. heard D.A. ask defendant to stop hanging on her, but she did not move off his lap. Defendant stopped rubbing D.A.'s shoulders as Susan approached them. Defendant convinced Susan to try riding defendant's bicycle, and Z.A. followed Susan on foot, leaving D.A. with defendant.

Z.A. testified that D.A. took a 20-minute bicycle ride with defendant one evening, and Susan and Z.A. became concerned that they were gone that long. When D.A. returned, she got off the bicycle on the wrong side, which indicated to him that something had happened, and went to her room.

---

**3** Officer Cole Sinatra testified that he was dispatched to respond to the call on July 8, and Officer Michael Morgantini spoke with Susan that same day, the day she reported the incident to police.

Cory lived at the same mobile home park as Susan and her children. He met defendant there while walking one day and they became friends. Cory knew defendant for about a month and was with him during fireworks on July 4. Cory was at Susan's house with defendant and Susan's children just before the fireworks. Cory, defendant, and the children bicycled to a location to see the fireworks, and Susan arrived later. Cory saw defendant leaning against a post and hugging D.A. from behind her in a way that a romantic couple would do. Defendant's behavior became less affectionate towards D.A. when Susan arrived.

A week or two later, Cory was riding bicycles with defendant, and defendant "just took off" when they saw two police cars arriving in the area.

Officer Morgantini was a detective assigned to sexual assault and child molestation cases in July. Morgantini interviewed defendant after his arrest on July 15. The recorded interview was played for the jury. When initially questioned regarding D.A.'s allegations, defendant said that "nothing happened," and that he had never been charged with molesting a child. Defendant said that he been bicycling with D.A. on the back of his seat but had to take a break when he got a cramp. Defendant claimed that he was only trying to be a friend and purchased the bicycles for the children because they did not own any.

When Morgantini told defendant that he knew the assault had occurred and wanted to know if D.A. had given him any signals, defendant responded, "I first met her. She kept saying, 'I want to go to your house ….' [E]ven said this in front of her mother.… I was supposed to go over the next morning to pick them up, pick her up …. Uh, uh. I'm not taking her over there 'cause a little girl like that don't belong over there around me, around other guys …. So I didn't, nothing ever happened."

Defendant then admitted that "she hugged me. I hugged her. That's it. Far as it went." He denied that his hands touched D.A.'s vagina. Defendant claimed that they hugged face to face. Defendant claimed that D.A. reminded him of his daughter, and he

7.

was not thinking of touching her sexually. Morgantini accused defendant of lying and asked him to explain why he did it. Defendant replied, "Loneliness. I'm not with a woman." Defendant agreed that loneliness made him decide to "advance things" with D.A. Defendant admitted that he asked D.A., "Do you feel it?" and that he was talking about a "[g]uy and woman [expletive] thing." He admitted that he was pushing against D.A. and was not in a right state of mind but denied that he had rubbed his penis on her. Defendant claimed that he touched "her butt" and did not touch her vagina. Defendant then admitted that he rubbed against D.A. but denied that his hands touched her vagina.

Defendant said that the only thing he did was "push[ ], that, that one little thing," while she was in front of him. Morgantini asked, "So you pushed your penis against her front, like, where her vagina is?" Defendant started to answer, "[I]t comes up," when Morgantini asked defendant to explain what he meant when he asked D.A. whether she felt it. Defendant responded, "I'm not gonna go into detail about it. I don't have to tell you exactly what. You know what I'm talking about." Morgantini explained that defendant needed to be more specific, and defendant replied, "Above the vagina, not this vagina." Morgantini insisted that defendant explain the part of his body he referred to when he asked, "Do you feel it?" Defendant replied, "Okay, my penis."

Defendant then told Morgantini that he did not have a woman and had tried to find a girlfriend. He also said that D.A. had "come onto" him, wanted to sit in his lap, wanted to kiss him "and stuff," and "[i]t just happened." Defendant admitted that he had a problem and did not want to lie about it anymore. Defendant admitted that he was attracted to younger girls sometimes because "they're sweet" and "nice," and he just wanted someone to show him affection.

When he took D.A. on the bicycle ride, he planned on being alone with her and to hug her but denied that he intended to have sex with her and just wanted to feel what a "man and a woman does when they press up against each other." Defendant then admitted that he hugged D.A. to make himself "horny" and rubbed his penis against her

to "make myself get off, and that's it." Defendant agreed when Morgantini said, "And you're rubbing your penis above her vagina or on her vagina squeezing her butt." Defendant denied that he intended to have sex with D.A. and stated, "I took her back there just to get a hug, do rubbing, and release pressure, and that was it." Defendant told Morgantini that D.A. "wanted to go my house and have sex, and I told her no," so "it wasn't all me."

Defendant offered the expert testimony of Dr. Richard Leo, a professor of law and psychology, specializing in police interviewing, police interrogation, psychological coercion, and true and false confessions. Dr. Leo discussed the factors that can lead to a false confession and different types of false confessions. Dr. Leo identified several circumstances present or techniques used by Morgantini in defendant's interrogation that could give rise to a false confession, such as the officer's presumptive bias that D.A. was telling the truth and defendant was guilty, minimization of defendant's blameworthiness to encourage defendant to confess, suggestions that evidence existed apart from D.A.'s statement, contamination by providing defendant facts of the investigation, and psychological inducement by suggesting that D.A. could commit suicide if defendant did not confess.

Dr. Leo agreed that a false confession is the exception to the rule, that the interrogation techniques used by police are not designed to elicit false confessions. Dr. Leo also testified that he did not see any particular vulnerabilities in defendant that increased the likelihood of a false confession.

## DISCUSSION

### I.      The evidence of touching and use of force was sufficient to support the jury verdicts that defendant committed lewd acts on a child by force.

Defendant challenges the sufficiency of the evidence supporting his convictions for committing forcible lewd acts on D.A. in counts 1 and 2, pursuant to section 288, subdivision (b)(1). He contends his conviction on count 1 lacked sufficient evidence that

9.

he touched D.A.'s vagina, and, as to both counts, the evidence was insufficient to establish that he used the requisite physical force in committing the lewd acts. We disagree.

### A.  Standard of Review and Applicable Law

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.)

Section 288, subdivision (a) provides in relevant part: "[A] person who willfully and lewdly commits any lewd or lascivious act … upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony." Thus, the offense has two elements: " ' "(a) the touching of an underage child's body (b) with a sexual intent." ' " (*People v. Villagran* (2016)

10.

5 Cal.App.5th 880, 890.) " 'Any touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404; accord, *People v. Martinez* (1995) 11 Cal.4th 434, 445 (*Martinez*).)

Section 288, subdivision (b)(1), further prohibits the commission of such a lewd or lascivious act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." " 'Force, in this context, means physical force that is " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " ' " (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391; accord, *People v. Soto* (2011) 51 Cal.4th 229, 242 ["This formulation was, and remains, an appropriate definition of the force required for an aggravated lewd conduct conviction under section 288[, subdivision ](b), now section 288[, subdivision ](b)(1)."].)

" 'A defendant uses "force" if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act.' [Citation.] 'The evidentiary key to whether an act was forcible is not whether the distinction between the "force" used to accomplish the prohibited act and the physical contact inherent in that act can be termed "substantial." Instead, an act is forcible if force facilitated the act rather than being merely incidental to the act.' " (*People v. Morales* (2018) 29 Cal.App.5th 471, 480; accord, *People v. Jimenez*, *supra*, 35 Cal.App.5th at p. 391; *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1024.)

The testimony of the victim of a lewd and lascivious act may be sufficient by itself to establish the elements of the crime. (Evid. Code, § 411; *People v. Westek* (1948) 31 Cal.2d 469, 473; *People v. Harlan* (1990) 222 Cal.App.3d 439, 454.)

## B. Analysis

### 1. Count 1- Touching

Defendant argues that D.A.'s testimony was insufficient to prove that defendant was guilty as charged in count 1 because D.A.'s testimony did not establish that defendant touched her vagina. We disagree.

D.A. testified that defendant touched her "vagina area" over her clothes and that she thought he was trying to rub her vagina because he rubbed his hand across the upper portion of her vagina area and then rubbed downward. When she tried to pull his hand away, defendant continued to rub it. D.A. testified that she also told Susan that defendant touched her "vagina area," her upper legs, and near her ribs. Section 288 prohibits the touching of an underage child's body with a sexual intent, but nothing in the language of section 288 restricts the manner in which contact with the minor's body can occur or requires that specific or intimate body parts be touched. (*People v. Villagran, supra,* 5 Cal.App.5th at p. 890; *Martinez, supra,* 11 Cal.4th at p. 443.) D.A. testified that defendant was shaking and poking his penis into her back while he was rubbing this area of her body. Therefore, the evidence was sufficient to establish that defendant touched a part of D.A.'s body with a sexual intent. Defendant confessed to his sexual intent, although he did not admit to touching her vagina.

Defendant argues that the area of D.A.'s body that D.A. described was not, in fact, her vagina. Defendant argues that "[t]he 'vagina' is an internal organ defined in its ordinary usage as 'a canal in a female mammal that leads from the uterus to the external orifice of the genital canal.' " Defendant recognizes that cases involving sexual penetration have treated the term vagina as synonymous with "female private parts" (see *People v. Paz* (2017) 10 Cal.App.5th 1023, 1037) but argues that D.A.'s description of where defendant touched her does not even satisfy such a broad definition.

However, our Supreme Court recognized that section 288 was written broadly and "prohibits *all* forms of sexually motivated contact with an underage child.… [T]he 'gist'

12.

of the offense has always been the defendant's intent to sexually exploit a child, not the nature of the offending act." (*Martinez*, *supra*, 11 Cal.4th at p. 444.) The *Martinez* court noted that "other felony sex offenses prohibit the commission of certain clearly specified acts against nonconsenting victims of any age. (See §§ 243.4 [defining sexual battery as 'intimate' touching of specific body parts], 261, [rape], 286 [sodomy], 288a [oral copulation], 289 [sexual penetration by foreign object]; [citation].) Each such provision describes the criminal act in precise and clinical terms. When contact with or penetration of a specific body part or cavity is required, or when use of a particular appendage or instrument is necessary to commit the offense, this fact has been made eminently clear." (*Id*. at p. 443, sixth bracketed insertion added.) Thus, while the specificity of the act and body part is required by the language of the statute in such other laws, any lack of specificity in a section 288 victim's testimony does not affect the sufficiency of the evidence to prove the crime.

A conviction for section 288 does not require proof that defendant touched D.A.'s vagina, but only that he touched a part of her body that she described as her vagina. D.A. adequately described the area to which she was referring even if she did not use the proper anatomical description. In discussing the sufficiency of generic testimony in the context of a child's testimony of sexual abuse, our Supreme Court described, "The victim, of course, must describe the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy)." (*People v. Jones* (1990) 51 Cal.3d 294, 316.) Since section 288 criminalizes "any touching," D.A.'s failure to use the proper terminology for the area defendant touched does not affect the sufficiency of evidence for conviction of that offense.[4]

---

[4] Defendant has not argued any variance between the charges and the proof at trial. We note, however, that "[i]nconsistencies and contradictions … of child witnesses at trial is not

13.

D.A.'s testimony established that defendant used his hand to rub a part of her body she described as her "vagina area." The evidence was sufficient to establish that defendant touched her as she described whether or not "vagina" was the proper term to describe it. Defendant's acts of rubbing D.A.'s pubic area sufficed to meet the touching element of count 1 when examining the entire record.

### 2. Counts 1 and 2- Force

Defendant argues that D.A.'s testimony was insufficient to establish that he used force to touch her body with sexual intent. We disagree.

"[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" are sufficient to support a finding that the lewd act was committed by means of force. (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.) The court in *Alvarez* stated that the defendant's actions of resisting the victim's attempts to push him away when he attempted to kiss her, holding her while he digitally penetrated her, and continuing to put her hand on his penis whenever she moved it away were sufficiently distinct from the lewd conduct to constitute use of force. The court concluded this evidence supported the defendant's convictions for committing a forcible lewd act on a child. (*Ibid.*)

Here, D.A.'s testimony established that, while she was leaning against defendant's lap, defendant wrapped his arms tightly around her chest and locked his legs so she could not move her own legs. D.A. tried to kick defendant, but she testified that he would not budge. She told the jury that defendant was holding her so tightly that she could not move even though she tried to break free. When she tried to pull free, defendant pulled her sweater and she fell back onto him. However, defendant could not grab her again and

---

persuasive of appellant's contention that the incidents at trial were completely different from the incidents described at the preliminary hearing. The inconsistencies went to the weight and credibility of the testimony, not to the question of notice claimed by appellant." (*People v. Gil* (1992) 3 Cal.App.4th 653, 659.)

14.

D.A. was able to almost free herself, but then tripped when defendant squeezed his legs harder, and she fell to the ground.

Given this evidence, it was reasonable for the jury to find that defendant had restrained D.A. for a period of time, using both his arms and his legs to restrict her movement. Defendant's restraint of D.A., using his arms and legs, is sufficiently distinct from his actions of touching her vagina area with his hand and her back with his penis to establish the requisite use of force for violating section 288, subdivision (b).

Defendant's arguments to the contrary are not persuasive. He argues that D.A. willingly sat on his lap when he asked her to do so and that the evidence only demonstrated he wrapped his arms and legs around her as an embrace. Even if the testimony could be reasonably reconciled with a contrary finding that defendant did not use force, reversal of the judgment is not warranted because D.A.'s testimony reasonably supports the jury's finding that defendant used force. (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 60.) Defendant also argues that D.A. testified that defendant's hand was just sitting on her and, therefore, defendant was not using force to rub her vagina area. However, D.A. testified that defendant's hand was rubbing her at other times during the incident and, in any event, defendant's use of force is supported by the evidence that he restrained D.A. with his arms and his legs, not that he rubbed D.A. with his hand. We also reject defendant's argument that evidence of force was insufficient because D.A. eventually broke free of defendant after the touching occurred in light of her testimony that she struggled unsuccessfully to free herself before she was able to break free.

We conclude the jury's convictions for forcible lewd conduct on a child were supported by sufficient evidence.

**II.** **The trial court did not abuse its discretion by admitting evidence of defendant's prior convictions for sex offenses.**

### A. Background

The prosecutor moved to admit evidence pursuant to Evidence Code section 1108 of defendant's convictions in 1992 for forcible rape (§ 261, subd. (a)(2)), rape by a foreign object (§ 289, subd. (a)), forcible oral copulation (§ 288a, subd. (c)(2)), and kidnapping (§ 207, subd. (a)), which resulted in a 27-year prison term, and his conviction in 2019 for the sexual battery (§ 243.4, subd. (e)(1)) of his 75-year-old aunt. The prosecutor's motion explained that while defendant was residing in his aunt's residence, he entered her bedroom and refused to leave. One such time, defendant demanded a hug, squeezed his aunt tightly, refused to let go when she requested, and rubbed against her. Another time, defendant placed his hand on her thigh and slid it close to her vagina. Defendant filed a written objection and argued that the 2019 case did not include any evidence that defendant was sexually gratified by his conduct.

During hearing on the motion, the prosecutor advised the trial court that they would introduce evidence of the 1992 and 2019 convictions through certified court records that establish the dates and names of the offenses. Defense counsel objected to the 1992 convictions and argued that the evidence was more prejudicial than probative because the convictions were approximately 30 years prior to the trial and the underlying facts involved more serious sexual offenses and an adult victim. At a continued hearing, defense counsel again mentioned the remoteness of the 1992 convictions and argued that the convictions were dissimilar to the instant offense as it involved use of a weapon and sexual penetration.

The trial court recognized that evidence of propensity to commit sex offenses is presumptively admissible pursuant to Evidence Code section 1108 in sexual assault and child molestation cases because such offenses are committed in secret and involve credibility contests. Balancing the probative value of the evidence in this case with the

prejudicial value, the trial court found that the probative value of the evidence was strong because defendant used force to accomplish his sexual goals against nonconsenting victims in both the prior and instant cases. The trial court found that probative value of the force used against the victims was not lessened even though the force in the instant case was not the same level of violent force used in the 1992 convictions. The court found that the 2019 conviction was not particularly inflammatory in comparison with the instant offense, and that the 1992 convictions were not more inflammatory when compared to committing a sex act on a child in the instant case. A juror would view both types of crimes as "about equal." While acknowledging that the 1992 convictions were approximately 30 years old, the court concluded that such remoteness was mitigated because Evidence Code section 1108 does not limit admission of this evidence based upon when it occurred and defendant was in prison between 1992 and 2005, sentenced to prison after two separate convictions for failing to register as a sex offender, and then committed another sex offense in 2019.[5] The potential for distraction or confusion by the jury was nonexistent because defendant had been convicted of the prior offenses and the jury would not feel it necessary to punish defendant in the instant case under the belief he may not have been punished for his prior crimes. The prior crimes would be proven by certified conviction records and take very little of the jury's time.

Ultimately concluding that the evidence was more probative than prejudicial, the court ruled that the evidence was admissible but limited evidence of the 1992 convictions to reflect "two rapes against two individuals" and excluded reference to the kidnapping charge, use of a weapon, and infliction of great bodily injury in that case.

---

**5** The trial court noted that defendant was convicted in 2013 and 2016, however, court records indicate that defendant was convicted for these offenses in 2015 and 2017 and, while originally sentenced to probation for the 2015 conviction, defendant was sentenced to two years in prison as to each offense in 2017.

## B.     Applicable Law and Standard of Review

Defendant now argues that the trial court abused its discretion in admitting evidence as to the 1992 convictions but does not challenge admission of the 2019 conviction.

Evidence Code section 1108 allows the prosecution to introduce evidence that the defendant in a sexual offense case committed other, uncharged sexual offenses as character evidence, notwithstanding the fact that such evidence is usually inadmissible under Evidence Code section 1101.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)  Evidence Code section 1108 "was intended in sex offense cases to relax the evidentiary restraints [Evidence Code] section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility."  (*Falsetta*, at p. 911.)

Evidence made admissible by Evidence Code section 1108 remains subject to exclusion under Evidence Code section 352 if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code, § 352; see *Falsetta*, *supra*, 21 Cal.4th at pp. 916–917.)  The prejudice that Evidence Code section 352 seeks to avoid is not that which " ' "naturally flows from relevant, highly probative evidence." ' "  (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.)  Rather, prejudice in this context evokes " ' "an emotional bias" ' " or " ' " ' "prejudging" a person or cause on the basis of extraneous factors.' " ' "  (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1115.)

Evidence Code section 352 generally gives a trial court discretion to " 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' "  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160, fn. 3.)  As our Supreme Court explained, when a

18.

defendant is charged with multiple sex offenses, the offenses " 'may be dissimilar enough, or so remote or unconnected to each other, that the trial court could apply the criteria of [Evidence Code] section 352 and determine that it is not proper for the jury to consider one or more of the charged offenses as evidence that the defendant likely committed any of the other charged offenses.' " (*Id*. at p. 1163.)

We review a trial court's ruling under Evidence Code sections 352 and 1108 for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.) We will not disturb a trial court's exercise of discretion unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Dworak* (2021) 11 Cal.5th 881, 899–900, citing *People v. Miles* (2020) 9 Cal.5th 513, 587, 587–588.)

### C.    Analysis

When evaluating the prejudicial effect of evidence of uncharged acts, courts balance a number of factors such as "degree of certainty of its commission," how likely it is to distract the jury from the main inquiry, whether it is similar to the charged offense, what sort of prejudicial impact it is likely to have on the jurors, the burden on the defendant in defending against the uncharged offense, and "the availability of less prejudicial alternatives to its outright admission, such as … excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

Here, the evidence of the uncharged acts had probative value because defendant used force to accomplish his sexual goals against nonconsenting victims in both the prior and instant cases, and where force is a common element in the offenses. Defendant argues that the prior convictions are dissimilar to the instant case because defendant did not commit an act of sexual penetration on D.A., unlike the 1992 convictions. However, we do not find this attempted distinction compelling given that D.A. interrupted defendant's actions by breaking free and Susan called defendant inquiring as to the

19.

whereabouts of her child. Therefore, although the charges in the instant case did not allege sexual penetration as in the 1992 convictions, that difference is not sufficient to detract from the probative value of the prior convictions to show defendant's propensity to commit the instant offense.

Defendant posits the evidence should have been excluded because the offenses were remote in time, occurring approximately 28 years prior to the instant crime. However, there are no established time limits rendering uncharged sexual offenses inadmissible because they are too remote in time. (*People v. Pierce* (2002) 104 Cal.App.4th 893, 900.) "[T]he passage of a substantial length of time does not automatically render the prior incidents prejudicial." (*People v. Soto* (1998) 64 Cal.App.4th 966, 991.) Furthermore, defendant was in prison for approximately 15 years of that time, a factor to be considered when addressing remoteness. (See, e.g., *People v. Loy*, *supra*, 52 Cal.4th at p. 62 [no reason to exclude offenses committed 15 and 21 years before the charged crimes where defendant was in prison during much of the intervening years]; *People v. Dworak*, *supra*, 11 Cal.5th at pp. 887, 901 [prior sexual offenses 15 years before charged crimes were admissible where the defendant was incarcerated or on parole for bulk of time between the two incidents].)

Despite their age, defendant's 1992 convictions are not too remote to be probative when considering that defendant had been in custody for 15 years on the charges, convicted of failing to register as a sexual offender in 2015 and 2017, and pleaded guilty to sexual battery of an elderly relative the year before committing the instant offense. Although the 1992 convictions might not have been as probative if defendant had lived a law-abiding life since his release from prison, the age of the prior 1992 convictions under the circumstances here did not lessen its probative value.

Courts have allowed evidence of sexual offenses committed 30 years prior to the charged crime. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284.) "[S]ignificant similarities between the prior and the charged offenses may 'balance[ ] out the

remoteness.' " (*Id.* at p. 285, first bracketed insertion added.) "[I]f the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*Ibid*.) Here, the trial court found the uncharged sexual offenses similar to the instant charge because defendant committed the sexual offenses using force, thus, we reject defendant's contention that his 1992 convictions should have been excluded because they were too remote in time.

Defendant relies on *People v. Harris*, *supra*, 60 Cal.App.4th 727 in support of his contention his 1992 convictions were too remote in time. However, *Harris* is factually distinguishable from the present case. There, the prior offense was forcible and violent in the extreme, involving mayhem of the victim with an ice pick, but the charged offenses involved breach of trust and non-forcible sexual fondling. (*Id.* at pp. 733, 738.) In the instant case, defendant was charged with forcible lewd touching of a child and the trial court could reasonably conclude that evidence of his prior use of force during the 1992 sexual offenses was particularly probative as disposition evidence deemed relevant by Evidence Code section 1108.

Proof of the 1992 convictions consisted of redacted and certified conviction records, which took only minutes to enter into evidence and did not involve any testimony or inflammatory details. There was no substantial danger of undue prejudice because, while the 1992 convictions involved a dangerous weapon and penetration of the victim, the circumstances of the prior convictions were not revealed to the jury and the jurors would not view rape as more inflammatory than performing a sex act on a child. " ' " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code ]section 352, "prejudicial" is not synonymous with "damaging." ' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

We conclude that the trial court did not abuse its discretion in admitting evidence of defendant's prior convictions for sexual offenses.

### III. The trial court did not abuse its discretion by refusing to strike prior convictions.

Defendant argues that the trial court abused its discretion in denying his request to strike his prior felony convictions pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504 (*Romero*).[6] We reject defendant's argument as the trial court acted within its discretion in denying defendant's motion.

#### A. Background

Defendant's prison records show that in 1992, he was convicted of kidnapping, five counts of rape, two counts of rape with a foreign object, and oral copulation by force and sentenced to a term of 27 years in prison. Between 2006 and 2015, defendant was convicted of driving under the influence, two drug-related misdemeanors, and five misdemeanor counts of driving on a suspended license. Defendant's criminal history indicates that he violated his probation for the misdemeanor offenses at least eight times. Defendant was convicted of failing to register as a sexual offender in 2015 and was sentenced to a three-year term of probation and one year in jail. He failed to register again in 2017, was sentenced to two years in prison, and resentenced to two years in prison for the 2015 conviction. In 2019, defendant pleaded guilty to sexual battery of an elderly relatively and was sentenced to a three-year probation term and 180 days in jail.

The probation officer described the circumstances relating to the crime as involving a particularly vulnerable victim, who had learning disabilities and bipolar disorder, and involving planning and criminal sophistication in that defendant groomed the children by gifting them bicycles and otherwise befriending the family. Defendant

---

[6] A defendant's request for this type of leniency is commonly referred to as a "*Romero* motion," although defendants do not actually have a right to make motions under section 1385. (*People v. Carmony* (2004) 33 Cal.4th 367, 375, 379 (*Carmony*).)

performed poorly while on probation and postrelease supervision. Defendant denied that he committed the 1992 offenses and showed no remorse for the instant offense.

Defense counsel orally requested that the trial court strike all but one of defendant's prior convictions for the nine offenses in 1992 and argued that (1) the prior strike convictions were remote in time, (2) the convictions predated the enactment of the Three Strikes law, (3) defendant's offenses since his release from prison were mostly nonviolent, (4) his only prison sentence since the 1992 convictions was for failing to register as a sexual offender, and (5) the instant offense was less violent than the 1992 offenses.

The trial court denied the motion and found that defendant did not fall outside the spirit of the Three Strikes law considering the circumstances of defendant's prior felony convictions the facts involved in the instant case. The court noted that while the prior strike convictions dated back to 1992, defendant received a 27-year sentence in state prison. The prior offenses were very serious and involved two separate victims. Defendant kidnapped and raped one 51-year-old victim at knifepoint. On a separate occasion, defendant drove an 18-year-old victim to a remote location, raped her, and then forced her to orally copulate him.

The trial court further found that defendant's life was not free of crime after he was released from prison. While defendant's many offenses of driving on a suspended license were "relatively minor," defendant was convicted of two different failures to register as a sexual offender and sentenced to prison. After release from prison, defendant was convicted of sexual battery on an elderly relative and then committed the instant offense. The trial court considered that while the instant offense did not involve the most severe type of lewd offense, D.A. was particularly vulnerable given her learning disabilities and that defendant specifically ingratiated himself with the family to gain access to D.A.

23.

The trial court exercised its discretion to deny defendant's request to strike all but one of his 1992 prior convictions based upon the severity of defendant's prior crimes, the length of time he had spent in custody, defendant's commission of numerous offenses since his release from custody, his commission of a sexual offense just prior to the instant offense, and the circumstances of the instant offense.

## B. Standard of Review and Applicable Law

Section 1385 grants trial courts discretion to dismiss a prior strike conviction if the dismissal is in furtherance of justice. (§ 1385, subd. (a); *Romero*, *supra*, 13 Cal.4th at pp. 504, 529–530.) " 'A court's discretion to strike [or vacate] prior felony conviction allegations [or findings] in furtherance of justice is limited. Its exercise must proceed in strict compliance with … section 1385[, subdivision ](a) .…' " (*People v. Williams* (1998) 17 Cal.4th 148, 158, third bracketed insertion added.) The Three Strikes law "was intended to restrict courts' discretion in sentencing repeat offenders." (*Romero*, at p. 528; accord, *People v. Garcia* (1999) 20 Cal.4th 490, 501 ["a primary purpose of the Three Strikes law was to restrict judicial discretion"].)

The Three Strikes law establishes " 'a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike,' " unless the sentencing court finds a reason for making an exception to this rule. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) There are "stringent standards that sentencing courts must follow in order to find such an exception." (*Ibid.*) In order to dismiss a prior strike conviction, "the court in question must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams*, *supra*, 17 Cal.4th at p. 161.)

A trial court's decision not to dismiss a prior strike conviction is reviewed under the deferential abuse of discretion standard. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) The Three Strikes law establishes that not striking a prior serious felony conviction is the norm, and there is a "strong presumption that any sentence that conforms to sentencing norms is both rational and proper." (*Id.* at p. 378.) An abuse of discretion is established by demonstrating that the trial court's decision was "irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) "Where the record is silent [citation], or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law,' " we are required to affirm the trial court's ruling, " 'even if we might have ruled differently in the first instance.' " (*Carmony*, at p. 378, first bracketed insertion added.)

### C.     Analysis

We conclude that defendant has failed to establish that the trial court's denial of his request to strike his prior felony convictions was outside the bounds of reason under the facts and the law.[7] We may not find an abuse of discretion unless the decision was so irrational or arbitrary that no reasonable person could agree with it. And here, it was not.

At sentencing, the trial court found that defendant did not fall outside the spirit of the Three Strikes law because defendant's prior crimes were very serious, involved multiple victims, and resulted in a 27-year prison sentence. Defendant's lengthy criminal history involved relatively minor offenses until he was convicted of failing to register as a

---

[7]     At sentencing, defense counsel argued that the trial court should strike all but one of his prior convictions arising from the nine 1992 offenses. Here, however, defendant argues that the court abused its discretion in refusing strike "at least one of his remote priors." Because defendant's sentence would only change if the trial court reduced his prior strikes to one, we shall examine the trial court's refusal to grant defendant's request to strike all but one of his prior convictions from the 1992 offenses.

sexual offender and committing sexual battery on an elderly relative. While the instant offense did not involve the same level of violence as the 1992 offenses, defendant's conduct was similarly dangerous in targeting a vulnerable child and ingratiating himself with the family to obtain access to her.

The trial court's discussion of proper considerations along with the presumption that denial of a *Romero* motion is a proper exercise of discretion (see *Carmony*, *supra*, 33 Cal.4th at p. 378) support our conclusion that the trial court's denial of defendant's request was not an abuse of discretion. The trial court's decision was not "so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.) As we explain *post*, defendant's arguments do not persuade us.

Defendant contends the trial court abused its discretion in denying his *Romero* motion because he would still be sentenced to 25 years to life under sections 667.61 and 667.71, a significant sentence given he was 64 years old, the instant offenses did not involve great violence, great bodily harm, or viciousness, and his convictions since 1992 did not demonstrate an escalating seriousness.

The trial court concluded that while defendant's sexual offenses may not have increased in violence over time, defendant's current crimes evidenced a similar egregiousness because he had targeted a particularly vulnerable victim. Additionally, we note that defendant could more easily abuse the elderly and children without using the same level of violence to overcome his victims. Furthermore, the lack of sexual penetration in this case could be the result of D.A.'s escape from defendant and Susan's call to defendant checking up on D.A.

Defendant also argues that his 75-year-to-life sentence is disproportionate to penalties for other crimes, including second degree murder (15 years to life) and aggravated mayhem (life without any minimum). However, the trial court did consider the length of defendant's sentence when it rejected the probation officer's and the prosecutor's recommendations to sentence defendant consecutively on both counts,

which would have resulted in a sentence of 150 years to life. Moreover, "the Three Strikes law was devised for the 'revolving door' career criminal, and was expressly intended 'to ensure longer prison sentences … for those who commit a felony' as long as they were previously convicted of at least one strike." (*People v. Strong* (2001) 87 Cal.App.4th 328, 331–332, fn. omitted.) Based upon defendant's history, defendant did not have any substantial period of time where he showed he was rehabilitating himself. The trial court correctly recognized that defendant did not fall outside the spirit of the Three Strikes law.

The court considered the proper criteria in ruling on defendant's motion, and we may not substitute our own judgment. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) The court here applied the correct standard. (See *ibid*.) Even if reasonable minds could differ about whether to strike the prior convictions in this case, this would not establish an abuse of discretion. (See *id*. at pp. 376–378.) In fact, only where the relevant factors manifestly support the striking of a prior conviction and no reasonable mind could differ would the failure to do so constitute an abuse of discretion. (*Id*. at p. 378.) This is not such a case.

Defendant has failed to show that the trial court was either unaware of its discretion or considered impermissible factors. We cannot say that its ruling was irrational or arbitrary such that no reasonable person could agree with it. The record shows that the trial court considered defendant's arguments as well as his criminal history and his conduct in the instant offense in declining to strike any of his prior serious felony convictions. On the record before us, the trial court did not abuse its discretion in deciding that his prior serious felony convictions and the instant offense fell within the spirit of the Three Strikes law.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.